**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SMART PACKAGING SOLUTIONS SA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 21-557-LPS |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| PERFECT PLASTIC PRINTING CORP., | ) | |
| | ) | |
| Defendant. | ) | |

**PLANTIFF'S ANSWERING BRIEF IN OPPOSITION TO
PERFECT PLASTIC PRINTING CORP.'S MOTION TO DISMISS**

OF COUNSEL:

Daniel A. Boehnen
Paul H. Berghoff
Grantland G. Drutchas
Andrew H. Velzen
MCDONNELL BOEHNEN
HULBERT & BERGHOFF LLP
300 South Wacker Drive
Chicago, IL 60606
(312) 913-0001

Dated;  March 29, 2022

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Plaintiff
Smart Packaging Solutions SA*

## <u>TABLE OF CONTENTS</u>

Page

I.  INTRODUCTION ........................................................................................................ 1

II.  STATEMENT OF FACTS ......................................................................................... 2

  A.  Subject Matter of the Asserted Patents ............................................................... 2

III.  LEGAL STANDARDS ............................................................................................. 2

IV.  ARGUMENT ............................................................................................................ 4

  A.  Subject Matter Jurisdiction and Standing .......................................................... 4

  B.  SPS's Infringement Allegations More Than Meet the *Iqbal/Twombly* Standard ............... 7

    1.  The Complaint is sufficiently plausible regarding the "extension antenna".................... 8

    2.  The Complaint is factually supported regarding "two windings" ("an inner winding" and an "outer winding") that are "connected in reverse phase with one another"......... 10

    3.  The Complaint is sufficiently plausible regarding "the extension antenna (EA) component has a sense opposite to that from the card antenna (CA) component"........ 12

    4.  The Complaint is sufficiently plausible regarding the "extension antenna" being disposed in "a third area located in the upper portion ... which is separate from the first area".................. 13

    5.  The Complaint is sufficiently plausible regarding the "the card antenna occupies only approximately the top half of the card body" ........................ 15

    6.  The Complaint is sufficiently plausible as to "inner winding" and "outer winding" .... 17

  C.  Indirect Infringement ........................................................................................ 19

V.  ALTERNATIVE RULING and CONCLUSION .......................................................... 20

## <u>TABLE OF AUTHORITIES</u>

### CASES

*A123 Sys., Inc. v. Hydro-Quebec*, 626 F.3d 1213 (Fed. Cir. 2010) ................................... 4

*Absolute Software v. Stealth Signal*, 659 F.3d 1121 (Fed. Cir. 2011) ................................... passim

*Advanced Cardiovascular Sys. v. Scimed Life Sys.*, 988 F.2d 1157 (Fed. Cir. 1993) .................... 3

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................. passim

*Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832 (Fed.
    Cir. 2009) ......................................................................................................................... 3

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) ...................................................................... passim

*Clouding IP, LLC v. Google Inc.* 61 F. Supp. 3d 421 (D. Del. 2014) ....................................... 5, 6

*Disc Disease Solutions v. VGH Solutions*, 888 F.3d 1256 (Fed. Cir. 2018) ......................... 3, 4, 8

*E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364 (Fed. Cir. 2003) ........................................ 9

*Erickson v. Pardus*, 551 U.S. 89 (2007) .................................................................................. 7, 8

*Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273 (Fed. Cir. 2007) ........................... 4

*Intell. Prop. Dev., Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333 (Fed. Cir. 2001).... 5

*Johns Hopkins Univ. v. 454 Life Scis. Corp.*, 123 F. Supp. 3d 563 (D. Del. 2015) ..................... 18

*Mentor H/S, Inc. v. Med. Device All., Inc.*, 240 F.3d 1016 (Fed. Cir. 2001) ........................... 3, 4

*Morrow v. Microsoft Corp.*, 499 F.3d 1332 (Fed. Cir. 2007) .................................................. 5, 6

*Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187 (Fed. Cir. 2007) .............................................. 5

*Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971 (Fed. Cir. 2005) ..................................... 3, 4

*Super Sack Mfg. Corp. v. Chase Packaging Corp.,* 57 F.3d 1054 (Fed. Cir. 1995) ..................... 5

*Tex. Digital Sys. v. Telegenix, Inc.,* 308 F.3d 1193 (Fed.Cir.2002) .......................................... 9

*Vaupel Textilmaschinen KG v. Meccania Euro Italia S.P.A.*, 944 F.2d 870 (Fed. Cir. 1991) ... 3, 4

*WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257 (Fed. Cir. 2010) ................................................ 2

## STATUTES

35 U.S.C. § 271 ........................................................................................................... 1, 2, 7

## RULES

Fed. R. Civ. P. 12(b)(1) ................................................................................................... 2, 4

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 3, 7

## I.     INTRODUCTION

Plaintiff Smart Packaging Solutions SA ("SPS") respectfully submits this answering brief in opposition to Defendant Perfect Plastic Printing Corp.'s ("PPP") Motion to Dismiss (D.I. 11) and accompanying brief (D.I. 12).  The Complaint (D.I. 1) asserts that PPP infringes U.S. Pat. Nos. 9,033,250 ("the '250 patent"); 9,165,240 ("the '240 patent"); 9,195,932 ("the '932 patent"); and 9,633,304 ("the '304 patent").  The Court should deny PPP's motion for at least the following reasons.

Initially, PPP argues that the Court lacks subject matter jurisdiction because the Complaint has not adequately pleaded SPS's standing.  D.I. 12, pp. 11-13.  But PPP ignores the full impact of the pleaded facts and relies on case law that is inapplicable.

Second, PPP asks this Court to dismiss SPS's direct infringement allegations.  PPP argues that the pleadings, including the detailed exhibit claim charts, do not adequately detail how PPP's accused products embody certain limitations of the asserted claims.  D.I. 12, pp. 13-24.  The Court should deny this request because the allegations of the Complaint (and related exhibit claim charts) more than meet the well-known *Iqbal/Twombly*[1] standard.  PPP's motion simply raises issues of claim construction and disputed facts that should and will be resolved during the claim construction phase of this case.  Further, PPP's motion itself shows that PPP understands the infringement assertions; PPP simply disagrees with them.

Third and finally, PPP argues that it cannot be liable for inducement or contributory infringement under 35 U.S.C. § 271(b) and(c) because the Complaint did not plead that PPP knew about the patents before suit was filed.  D.I. 12, pp. 24 and 25.  SPS disagrees that PPP did not know about the patents, but SPS does not dispute PPP's technical pleading argument.  More to the

---

[1] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

point, SPS does not want to waste discovery resources and burden the Court with this issue at this

time.  It will be enough to prove that PPP is guilty of direct infringement for which it is the direct

and primary actor.  Accordingly, SPS agrees to dismiss, without prejudice, all allegations of indirect

liability under 35 U.S.C. § 271(b) and (c) at this time, subject to future events as warranted by the

facts and the discretion of this Court.

## II.      STATEMENT OF FACTS

The patents involved in this lawsuit relate to "smart cards" that include a computer chip

having integrated circuits that encode essential personal identification data of a cardholder and that

communicate the data with card readers.  D.I. 1, ¶¶ 1 and 2.  Such smart cards digitally

communicate with card readers using either a contact interface, a contactless interface, or a "dual

interface" (i.e., an interface that includes both a contact interface and a contactless interface).  D.I.

1, ¶¶ 2-4.  Notably, the asserted patents cover improved antenna designs for a contactless interface

used in a smart card, either alone or as part of a dual interface.  D.I. 1, ¶ 4.  Thus, the inventions

improve "tap to pay" features of credit cards that have become popular among consumers for

completing transactions without having to insert or swipe a credit card.

### A.      Subject Matter of the Asserted Patents

For purposes of this answering brief only, Plaintiff does not dispute the description of the

asserted patents set forth in Defendant's brief.  D.I. 12, pp. 9 and 10.

## III.     LEGAL STANDARDS

For the Rule 12(b)(1) component of PPP's motion, the Federal Circuit has made clear that

the question of whether an exclusive patent licensee possesses all substantial rights in a patent --

and therefore has standing to bring suit independently – is a question of law controlled by Federal

Circuit precedent.  *See WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1263 (Fed. Cir. 2010);

*Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 840 (Fed.

Cir. 2009) ("The Federal Circuit 'defers to the law of the regional circuits on matters of procedural law that do not implicate issues of patent law.'").  Equally important, the Federal Circuit has made clear that, when analyzing the "all substantial rights" standing issue, the trial court must consider the parties' intent in drafting the license.  *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 978-979 (Fed. Cir. 2005) ("[T]his court has established that the intention of the parties to the Agreement and the substance of what was granted are relevant factors in determining whether all substantial rights in a patent were conveyed."); *Mentor H/S, Inc. v. Med. Device All., Inc.*, 240 F.3d 1016, 1017 (Fed. Cir. 2001) ("[A court] must ascertain the intention of the parties and examine the substance of what was granted . . . ."); *Vaupel Textilmaschinen KG v. Meccania Euro Italia S.P.A.*, 944 F.2d 870, 874 (Fed. Cir. 1991) ("We must . . . examine whether the agreements transferred all substantial rights to the '650 patent and whether the surrounding circumstances indicated an intent to do so.").  Under Federal Circuit law, as discussed in more detail below, the Complaint does adequately establish that all substantial rights were conveyed and conferred standing to SPS, and PPP has failed to articulate any evidence or substantive scenario to the contrary.

With respect to the Rule 12(b)(6) portion of PPP's motion, there can be no dispute that a complaint is merely required to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp.*, 550 U.S. at 570.  In patent cases, the plausibility standard is met when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Disc Disease Solutions v. VGH Solutions*, 888 F.3d 1256, 1260 (Fed. Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678).  "Disputed issues are construed favorably to the complainant, and all reasonable inferences are drawn in favor of the complainant.  Thus, to the extent that factual questions are raised and are material to the result, dismissal is improper unless there is no reasonable view of the facts which could support the claim." *Advanced Cardiovascular Sys. v. Scimed Life Sys.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993).  A Rule 12(b)(6) motion alleging

failure to adequately plead infringement must be denied if the Complaint states that a specific product infringes at least one claim of an asserted patent in sufficient detail to put the defendant on fair notice of the infringement allegation under the *Iqbal/Twombly* standard. *Disc Disease*, 888 F.3d at 1260.

## IV.    ARGUMENT

### A.    Subject Matter Jurisdiction and Standing

PPP's Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction argues that the Complaint does not adequately plead SPS's standing because the pleading does not use the magic words that SPS holds "all substantial rights" in the asserted patents. D.I. 12, pp. 12 and 13. Of course, the case law does not require any such magic words. Instead, the case law notes that the right to enforce the patents is the most important right because the key underlying policy issue is making sure that the defendant does not face the risk of multiple suits or inconsistent judgments. *See Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1278 (Fed. Cir. 2007); *and see A123 Sys., Inc. v. Hydro-Quebec*, 626 F.3d 1213, 1222 (Fed. Cir. 2010). PPP's motion acknowledged that the Complaint alleges SPS has the exclusive right to enforce the patents, but PPP relies on off-point case law to argue that the exclusive right to enforce the patents is not in itself enough to confer standing. D.I. 12, p. 12. PPP's motion also ignored Federal Circuit holdings that when assessing the "all substantial rights" question, the trial court must consider the parties' intent in drafting the license. *Sicom Sys. Ltd.*, 427 F.3d at 978-979; *Mentor H/S, Inc*, 240 F.3d at 1017; and *Vaupel Textilmaschinen KG*, 944 F.2d at 874. The Complaint pleaded that the license gave SPS the exclusive right to sue infringers in connection with all fields of use throughout the United States. D.I. 1, ¶¶ 10-13. These points show that the licensing parties intended SPS to sue in its own name; these points also eliminate the risk of multiple suits and/or inconsistent judgments that underlie the "all substantial rights" doctrine.

PPP cites three Federal Circuit cases and one district court case as establishing the basis for its jurisdiction/standing argument: (i) *Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1192-93 (Fed. Cir. 2007); (ii) *Intell. Prop. Dev., Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1342 (Fed. Cir. 2001); *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339 (Fed. Cir. 2007); and *Clouding IP, LLC v. Google Inc.* 61 F. Supp. 3d 421 (D. Del. 2014). The holdings of these cases are not on point and, thus, the Court is not bound by them.

The *Propat* case decided whether the plaintiff patent licensee had ***any*** substantial right giving it any standing to participate in the suit. The Court held that, although a licensee, Propat did not have any proprietary interest in the asserted patents. Further, the Court in *Propat* identified specific rights that the patent owner had retained and that undermined the plaintiff Propat's standing. *Propat*, 473 F.3d at 1192. As a result of those retained rights, the Court held that Propat was not an exclusive licensee, but was merely a "bare licensee" who lacked any standing to sue infringers, either alone or along with the patent owner as a co-plaintiff.

The *Intell. Prop. Dev.* case fares no better. In that case, the plaintiff licensee Intellectual Property Development, Inc. ("IPD") and co-plaintiff patent owner Communications Patents Ltd. ("CPL") had successfully moved to dismiss their case without prejudice based on their having given the defendant a *Super Sack*[2] covenant not to sue. Defendant TCI Cablevision of California, Inc. was unsatisfied and appealed, arguing that the case should been dismissed with prejudice. The Federal Circuit rejected the appeal and affirmed the dismissal without prejudice, noting that the contract rights and estoppel created by the *Super Sack* covenant meant there was no longer a case or controversy.

---

[2]  *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995).

The holding of *Morrow* is similarly off point.  In *Morrow,* the original patent owner filed bankruptcy and, during that proceeding, the bankruptcy court formed three different trusts, each of which received certain rights to the intellectual property of the bankruptcy estate.  Plaintiff Morrow was the trustee for one of those trusts known as "GUCLT."  Part of the standing dispute turned on whether the bankruptcy laws gave a trustee an ability to act for the collective benefit of multiple trusts.  Rejecting that position and holding plaintiff lacked standing to sue, the Federal Circuit explained:

> The problem for GUCLT and AHLT is that the exclusionary rights have been separated from the right to sue for infringement. The liquidation plan contractually separated the right to sue from the underlying legally protected interests created by the patent statutes - the right to exclude. For any suit that GUCLT brings, its grievance is that the exclusionary interests held by AHLT are being violated. GUCLT is not the party to which the statutes grant judicial relief. *Morrow*, 499 F.3d at 1342.

The final case, *Clouding IP, LLC v. Google Inc.*, does not even involve a license.  The issue was whether the underlying document constituted an assignment.  The district court concluded that the document did not constitute an assignment, explaining:

> …the Court concludes that the intent of the parties was to transfer title to the patents-in-suit, but only "subject to" the conditions of the Agreement. (PPA § 4.1) Clouding relies on PPA § 1.2, part of the Agreement's "Background," as evidence of Symantec's intent to convey formal legal title to Clouding. But that provision states, "Seller wishes to sell to Purchaser all rights, title, and interest in the patents and applications ... while retaining the License (as defined below) as set forth in more detail below.  *Clouding IP, LLC*, 61 F. Supp. 3d at 431.

Here, by contrast, SPS has pleaded both that it is "the exclusive licensee of [each of the Asserted Patents] *and* has the exclusive right to assert [each of the Asserted Patents] against any and all infringers throughout the United States and in all fields of use."  D.I. 1, ¶¶ 10-13 (emphasis added).  This pleading is uncontested and indisputable.

PPP has failed to identify any substantial right retained by the licensor that would support the assertion that PPP might be subject to any risk of multiple lawsuits or inconsistent judgments. Instead, PPP argues that, according to the assignment records of the U.S. Patent and Trademark

Office ("PTO"), the patents were recently (December 2021) assigned, apparently without input from SPS. The problem with this argument is that there was no real change in ownership. The assignment was from one AmaTech entity ("Feinics AmaTech Teoranta") to another AmaTech entity ("AmaTech Group Limited") as part of a corporate organization. PPP's own exhibit to its motion notes that the attorney docket on the PTO records simply identified the companies as "AmaTech." In other words, the patents remained in the same ownership hands before and after the document was recorded in the PTO.

### B.  SPS's Infringement Allegations More Than Meet the *Iqbal/Twombly* Standard

In the Rule 12(b)(6) portion of its motion, PPP asks this Court to dismiss the asserted infringement of all claims of the '250 patent, the '932 patent, the '304 patent, and the '240 patent simply because PPP disagrees with the well-pleaded infringement allegations in the Complaint. PPP's motion repeatedly relies on factual disputes with SPS's allegations. D.I. 12, pp. 13-24. Those arguments demonstrate that PPP does indeed understand the infringement allegations; it simply disagrees with them. Moreover in this setting, "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, (2007) (citing *Twombly, supra,* at 555-556, 127 S.Ct. 1955). This Court should deny PPP's request to dismiss because the pleadings fully meet and exceed the *Iqbal/Twombly* pleading standard.

The Complaint in this action states that PPP "makes, uses, sells, and offers for sale dual interface smart cards that utilize the inventions covered by the asserted patents, and does so without license or permission from SPS;" and that "PPP's activities infringe the asserted patents under 35 U.S.C. §§ 271 (a), (b), and (c)." D.I. 1, ¶¶ 17 and 18. The Complaint also specifically identifies PPP's products "under various names, including Contactless EMV Technology and Dual Interface/Contactless technology." D.I. 1, ¶ 17. Significantly, the Complaint also includes detailed

claim charts in the form of Exhibits E-H.  D.I. 1, ¶ 17, Ex. E-H.  These claim charts contain reverse engineered drawings of the accused PPP products and detailed factual allegations showing how the asserted claims read on the accused PPP products, including every element of claims 1, 2, 10, and 12 of the '250 patent; claims 1, 4, 6, and 9 of the '240 patent; claims 1, 2, and 4-6 of the '932 patent; and claims 1, 5, 8, and 11-13 of the '304 patent.  *Id.*

The factual allegations in SPS's Complaint and its exhibits are more detailed than the typical patent infringement complaint.  Indeed, the factual allegations in the SPS Complaint are far more detailed than the factual allegations of the complaint in the *Disc Disease* case, which the Federal Circuit concluded were "sufficient under the plausibility standard of *Iqbal/Twombly*."  888 F.3d at 1260.  In the *Disc Disease* case, the complaint "specifically identified the three accused products…and alleged that the accused products meet 'each and every element of at least one claim of the [asserted patents], either literally or equivalently.'"  *Id.*  The Federal Circuit noted that "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the…claim is and the ground upon which it rests."  *Id.* (quoting *Erickson*, 551 U.S. at 93).  Here, the pleadings in the Complaint not only go beyond giving PPP fair notice of infringement by the accused products but also visually and verbally set forth the factual basis for applying the claims against the accused products.  Thus, the Court should deny PPP's Motion to Dismiss because the Complaint easily satisfies the *Iqbal/Twombly* standard.

## 1.    The Complaint is sufficiently plausible regarding the "extension antenna"

Claim 1 of the '250 patent, claims 1 and 5 of the '932 patent; and claim 1 of the '304 patent each recite an "extension antenna."  PPP asserts that the Complaint fails to plausibly allege that the accused products include such an extension antenna.  D.I. 12, pp. 14-17.  In support, PPP points to portions of the detailed descriptions of the '250 patent, the '932 patent, and the '304 patent.  D.I. 12, pp. 14-16.  For example, PPP references portions of the '250 patent, the '932 patent, and the

'304 patent that discuss U.S. Pat. App. Pub. No. 2013/0146671 ("Grieshofer"), as well as FIG. 12B of Grieshofer.  *Id.*  Based on these sections, PPP claims that extension antennas in the present invention are distinct from the "dummy turn capacitor[s]" / "principally capacitive structures" described in the prior art.  D.I. 12, p. 15.  From that starting point, PPP argues that the "extension antenna" labeled in the SPS claim charts are in fact a "dummy turn," and therefore allegedly cannot constitute an "extension antenna."  D.I. 12, pp. 14-16.  This highly factual dispute cannot be resolved at this stage of the case.

At best, PPP's contention relies on a full claim construction of the term "extension antenna." Until claim construction occurs, the degree to which SPS's claim terminology is limited, if at all, by the prior art is unclear.  Even after claim construction, there will be a further disputed question of fact, making a dismissal on this basis is improper.  *Absolute Software v. Stealth Signal*, 659 F.3d 1121, 1129-30 (Fed. Cir. 2011) ("Infringement, whether literal or under the doctrine of equivalents, is a question of fact.").

At worst, PPP's argument relies on importing additional limitations into the patent claims from the detailed descriptions in the patents.  For example, it would require the addition of a limitation that states that an "extension antenna" excludes structures that are principally capacitive structures. Courts have cautioned against "unnecessarily importing claim limitations from the specification into the claims."  *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003) (citing *Tex. Digital Sys. v. Telegenix, Inc.,* 308 F.3d 1193, 1202 (Fed.Cir.2002)). It would be especially erroneous to import a negative limitation into the claims from the specification. However, even aside from the error of improperly reading an additional limitation from the specification into the claims, there is nothing in the "extension antenna" of the accused PPP product as labeled in the SPS claim charts that is inconsistent with a structure that "contribute[s] to the inductance of the booster antenna."  As noted above, this is a highly factual issue.

In short, SPS has plausibly alleged infringement of an "extension antenna." For at least

these reasons, the Court should deny PPP's Motion to Dismiss relative to the claim 1 of the '250

patent, claims 1 and 5 of the '932 patent; and claim 1 of the '304 patent.

### 2. The Complaint is factually supported regarding "two windings" ("an inner winding" and an "outer winding") that are "connected in reverse phase with one another"

Regarding claim 1 of the '240 patent, PPP asserts that SPS has not factually supported that

the accused products include "two windings" that are "connected in reverse phase with one

another." D.I. 12, pp. 17 and 18.  PPP nevertheless conceded that "SPS offers ... connecting the two

windings in such a manner as to give different phases to the different windings results in the two

windings being in reverse phase with one another." D.I. 12, p. 17.  Further, the Complaint provides

marked-up drawings of an accused product indicating that the accused product has two windings

with different senses. D.I. 1-1, p. 204.  It is axiomatic that patents are written for people skilled in

the art; and there can be no serious dispute that "phase" and "sense" are commonly recognized

terms of art.  While obviously not identical terms, persons of ordinary skill in the art fully recognize

and understand the two tightly related concepts.  PPP, itself, admits that "phase" relates to "voltages

induced" in windings based on how those windings are "connected." D.I. 12, p. 10.  As understood

by persons skilled in the art, the "sense" of a winding is related to how a winding is "connected"

and, therefore, has relevant bearing on the "phase" that would be induced in that winding.  Based on

this understanding, and as presented in the SPS claim charts, SPS has used the "sense" of the

windings of the PPP cards as a proxy to determine the

associated "phase."  For example, SPS's claim charts show

that windings have opposite senses in certain regions of the

card (e.g., regions where "inner windings" and "outer

windings" run adjacent to one another), confirming that the



windings are "connected in reverse phase with one another."  For instance, at right is a portion of a diagram provided in the claim chart of the '240 patent included in the Complaint.  D.I. 1-1, p. 204 (yellow circle added for emphasis).  As illustrated by the green arrow on the left side of the above drawing, the outer winding runs in a clockwise sense in at least some regions of the card.  *Id.* Similarly, as illustrated by the red arrow on the right side of the above drawing, the inner winding has a counterclockwise sense in at least some regions of the card.  *Id.*  Based on these labeled senses, at least a portion of the "outer winding" is running in an opposite direction of the "inner winding" (e.g., within the yellow circle region).  Therefore, signals transmitted in this section would run in opposite directions.  Thus, the "outer winding" and "inner winding" are in "reverse phase," as shown in SPS's claim charts.  Based on this understanding, SPS alleged that "[o]n information and belief, connecting the two windings in such a manner ... results in the two windings being in reverse phase with one another."  *Id.*  Regardless of PPP's paraphrasing, these claim charts go far beyond merely stating that "on information and belief, connecting the two windings in such a manner [that infringes] results in [infringement]."  D.I. 12, p. 17.  PPP understands the argument; PPP simply disagrees with it.  But it cannot be resolved without claim construction and fact resolution.

The above is just one example of how the exhibits of the Complaint show antennas of the accused products to be in "reverse phase."  This subject matter would be well understood by persons skilled in the art upon reading the patent.  Further, while claim construction and expert testimony may be required to ultimately demonstrate patent infringement to persons ***not*** skilled in the art, this involves issues that go far beyond mere pleading and cannot form the basis for dismissal.  *See, e.g.*, *Absolute Software*, 659 F.3d at 1129-30.

Thus, SPS has, at the very least, factually supported infringement of "two windings" that are "connected in reverse phase with one another" with respect to the accused products.  PPP has not

11

shown that it is unable to reasonably understand the allegations against it.  For at least these

reasons, the Court should deny PPP's Motion to Dismiss relative to the claims of the '240 patent.

> **3.    The Complaint is sufficiently plausible regarding "the extension antenna (EA) component has a sense opposite to that from the card antenna (CA) component"**

In a related argument, PPP asserts that SPS's claim construction mappings of the extension

antenna component that "has a sense opposite of that from the card antenna component" (claim 1 of

the '932 patent) and the claim 5 ('932 patent) feature of "one of the components has a sense which

is opposite one or more of the other components" are factually unsupported.  D.I. 12, pp. 18-20.

Regarding these claim features, PPP clearly understands that these features refer to the arrows that

SPS included in the claim charts of the Complaint (e.g., D.I. 1-1, p. 213).  D.I. 12, p. 19.  PPP

simply disagrees and argues with SPS's view of "sense."

As noted above, there can be no serious dispute that "sense" is a commonly recognized term

of art.  Further, as admitted by PPP, "sense" may "relate to physical orientation (clockwise or

counterclockwise) of a spiral-shaped component."  D.I. 12, pp. 18 and 19.  As also admitted by

PPP, the SPS claim chart indicated that the clockwise or counterclockwise sense of the accused PPP

products were determined "when winding inward toward the center of the card."  *Id*.  This makes

clear that, when following the direction the wire of a given antenna component takes as it winds

inward toward the center of the card, a clockwise sense or counterclockwise sense will result.  As

long as the labeling of "senses" is consistent across all antenna components (e.g., winding inward

toward the center for all components, as in SPS's claim charts), it is clear that "the extension

antenna (EA) component has a sense opposite to that from the card antenna (CA) components"

(claim 1 of the '932 patent) and, similarly, that "at least one of the components has a sense which is

opposite one or more of the other components" (claim 5 of the '932 patent).  Notably, it makes no

difference whether an inward-winding convention or an outward-winding convention is used to

determine clockwise sense vs. counterclockwise sense.  So long as the same convention is used across all antenna components, the accused PPP products would still infringe.  Hence, PPP's statement that "SPS provides ... no reasoning or rationale for assuming that the wire is 'winding inward toward the center of the card' (as opposed to outward toward the periphery of the card)" is irrelevant to the analysis.  D.I., p. 19.  Clearly, SPS's claim charts go far beyond "simply superimpos[ing] conclusory arrows onto purported product images and parrot[ing] the claims."  *Id*.

At best, PPP merely raises fact and claim construction issues, such as the construction of the term "sense" and how the "sense" of an antenna component can be determined.  *See, e.g.*, *Absolute Software*, 659 F.3d at 1129-30.  PPP's motion does not show that it cannot reasonably understand the accusations against it, nor that SPS has failed to adequately allege infringement of the claims of the '932 patent.  For at least these reasons, the Court should deny PPP's Motion to Dismiss relative to the claims of the '932 patent.

### 4.    The Complaint is sufficiently plausible regarding the "extension antenna" being disposed in "a third area located in the upper portion ... which is separate from the first area"

In addition to the arguments above regarding the "extension antenna" of the '250 patent, the '932 patent, and the '304 patent, PPP also argues that SPS's labeling of the "extension antenna disposed in the third area ... in the upper portion of the card body" for the accused products relative to claim 1 of the '250 patent is conclusory and inconsistent.  D.I. 12, pp. 20 and 21.

In support of its contention, PPP cites a drawing from SPS's claim chart for the '250 patent.  D.I. 12, p. 19.  PPP then claims that "the wires which form the structure that SPS calls an 'extension antenna' (dark green, above at right) actually extend ***downwards*** into what SPS calls the first area (dark blue, above at right)."  D.I. 12, p. 21.  This is a mischaracterization of SPS's labeling of the "extension antenna" relative to the accused products.

13

As illustrated in the Figure of Ex. E reproduced at right (from D.I. 1-1, p. 194), SPS has identified the "first area" (blue), "second area" (red), and "third area" (green) in the accused product, where the "third area" is "located in the upper portion of the card body" and "is separate from the first area and the second area."  As provided in the drawing that was referenced by PPP, the "extension antenna" is depicted in dark green and is located in the "third area" and the "coupler coil" is depicted in orange and is located in the "second area." Further, as illustrated in the other Figure of Ex. E reproduced at right (from D.I. 1-1, p. 192), the "card antenna" is depicted in light blue and is located in the "first area."



As indicated by all of these illustrations, and contrary to PPP's contention that SPS engaged in "haphazard, unclear labeling," SPS has taken care in labeling the respective portions of the accused products.  D.I. 12, p. 21.  The "third area" is labelled as being in direct contact with the "first area."  As such, some of the windings in the upper-right corner of the card are within the "third area," while others are in the "first area."  Likewise, as identified above by the light blue and dark green labeling, some of the windings of the "card antenna" (light blue) run directly adjacent to windings of the "extension antenna" (dark green).  As further illustrated, it is the windings of the labeled "card antenna" (rather than the labeled "extension antenna") that "actually extend **downwards** into what SPS calls the first area," as PPP puts it.  *Id*.  While it is theoretically possible that portions of the extension antenna terminate at (and thereby connect to) the card antenna, this does **not** necessarily mean that either antenna is mislabeled (indeed, all of the wires illustrated

might arguably be said to connect to one another through the "antenna module" of the card). Further, PPP's allegation that "it is impossible to understand where SPS alleges the purported card antenna starts and the purported extension antenna terminates" is inaccurate.  *Id*.  Based on the labeling of the "first area" and the "third area," themselves, in addition to the claim terminology that positions the "card antenna" in the "first area" and the "extension antenna" in the "third antenna," it is readily understood that the card antenna may start and the extension antenna may terminate at the interface between the "first area" and the "third area," exactly as illustrated in the claim charts of Ex. E.  *See, e.g.*, D.I. 1-1, pp. 192, 195, and 196.  Thus, while some windings in the accused products may proceed to a bottom half of the card, because these windings are not labeled as being part of the "extension antenna" and are not within the "third area," there is nothing inconsistent about the labeling of the accused products in the Complaint.

Thus, the Court should deny PPP's Motion to Dismiss relative to claim 1 of the '250 patent.

### 5.     The Complaint is sufficiently plausible regarding the "the card antenna occupies only approximately the top half of the card body"

In relation to claim 4 of the '240 patent, PPP states that the accused product illustrated in the claim chart includes an antenna that "extends *far* into the bottom half of the card" and, therefore, cannot plausibly infringe the claim element of "the card antenna occupies **_only_ approximately a top half** of the body."  D.I. 12, p. 21.  Further, PPP argues that "SPS simply ignores the term 'only'" in the claim element at issue.  D.I. 12, p. 22.  That is not correct.

Even if a portion of the antenna illustrated in the claim chart extends into the bottom half of the card, this does not mean that the claim element of "the card antenna occupies only *approximately* a top half of the card body" (emphasis added) cannot be infringed.  At best, whether or not such a card antenna is infringing depends upon the claim construction of the phrase "only *approximately* a top half."  Because this is a question of claim construction and fact, a dismissal on this basis is improper.  *See, e.g.*, *Absolute Software*, 659 F.3d at 1129-30.

A simple visual inspection of the figure above shows that perhaps 90%+ of the card antenna lies in the top half of the card body, and only a relative small "tail" was included so as to extend into the lower portion of the card body.  PPP's motive for including the tail is open to debate, but the situation clearly creates disputes of claim construction and fact resolution.

Even if the Court considered the construction of the phrase "only approximately a top half of the card body" at this time, the accused product covered in Ex. F still infringes claim 4 of the '240 patent, both literally and through the doctrine of equivalents.  As provided in the claim chart of Ex. F, col. 24, lines 5-19 of the '240 patent provide some context regarding the phrase "only approximately a top half of the card body."  D.I. 1-1, p. 205.  The cited portion of the '240 patent recites, *inter alia*:

> [T]he card antenna CA of FIG. 8 occupies ***only approximately the top half of the surface of the card body CB***, leaving the bottom half of the card body CB free for embossing, etc. ***In other words, the card antenna CA of FIG. 8 may extend along substantially all of the top side edge of the card body CB, only about halfway down the right and left side edges of the card body, and across a central portion of the card body***. The overall area encompassed by the card antenna CA is ***only about half of the overall area of the card body CB***."  The '240 patent, col. 24, ll. 13-19 (emphasis added).

If SPS's claim element were to be construed based on the above, the card antenna of PPP's accused product referenced in Ex. F satisfies the above description.  In particular, the card antenna illustrated in the Ex. F claim chart for claim 4 of the '240 patent: (1) extends along ***substantially*** all of the top side edge of the card body CB; (2) extends only ***about*** halfway down the right *and* left side edges of the card body; (3) extends across a central portion of the card body; and (4) only encompasses an area that is ***about*** half of the overall area of the card body.  *See* D.I. 1-1, p. 205.  At best, PPP raises a question of fact that, as mentioned above, should not be the basis for dismissal. *See, e.g.*, *Absolute Software*, 659 F.3d at 1129-30.

Preemptively, PPP asserted that the above arguments regarding the term "approximately" are untenable in stating that "[t]o the extent SPS suggests that dismissal is unwarranted because the

term 'approximately' can be construed to *remove* the term 'only' from the claim, the Court need not

engage in claim construction to dismiss infringement allegations which are 'patentably

unworkable.' ... No claim construction ... can transform the meaning of '*only* approximately a top

half' to include the *entire* bottom half of the card."  D.I. 12, p. 22.  Such statements are clear

hyperbole.  First, SPS does not insinuate that the term "only" should be wholly removed from the

claim.  Likewise, though, to the extent *PPP* suggests that dismissal *is* warranted because the term

"only" can be construed to *remove* the term "approximately" from the claim, the Court *needs* to

engage in claim construction before dismissing infringement allegations which *are* patently

workable.  Secondly, SPS is not asserting that "only approximately a top half" should be read as

"the *entire* bottom half of the card."  Far from it.  For example, as labeled in the claim chart for

claim 4 of the '240 patent, the "card antenna" in the accused product does not nearly occupy the

"*entire* bottom half of the card."  *See, e.g.*, D.I. 1-1, p. 205.  Instead, SPS is merely asserting that a

card antenna that briefly extends into a bottom half of the card in one region may nonetheless

"occup[y] only approximately the top half of the card body."

For at least the additional reasons above, the Court should deny PPP's Motion to Dismiss

relative to claim 4 of the '240 patent.

### 6.    The Complaint is sufficiently plausible as to "inner winding" and "outer winding"

Finally, PPP states that SPS's labeling of "inner windings" and "outer windings" on the

accused products is improper because such windings are "interleaved" windings and, therefore,

apparently cannot be "inner windings" and "outer windings."  D.I. 12, p. 22.  Based on this

statement, PPP asserts that infringement of claims 1, 4, 6, and 9 of the '240 patent; claim 6 of the

'932 patent; and claim 5 of the '304 patent is not plausibly alleged.  *Id*.  PPP's assertion reflects

arguments about issues of claim construction and disputed facts, not improper pleading.

In order to allegedly support the above argument, PPP points to FIGs. 4A and 4D and some associated description within the '240 patent.  D.I. 12, p. 23.  Specifically, PPP relies on col. 17, lines 34-41 / FIG. 4A as showing an "inner winding" and an "outer winding" and col. 18, lines 59-63 / FIG. 4D as showing "interleaved windings."  *Id*.  Unless and until claim construction, the degree to which SPS's claim terminology is limited, if at all, by the cited sections of SPS's patents describing a preferred embodiment is mere conjecture and attorney argument.  *See, e.g.*, *Johns Hopkins Univ. v. 454 Life Scis. Corp.*, 123 F. Supp. 3d 563, 566-567 (D. Del. 2015).  However, assuming for the sake of argument that the above-cited sections of SPS's patents were controlling regarding the interpretation of the claim terms "inner winding" and "outer winding."  Even given this assumption, while the referenced portions of SPS's patents certainly refer to "interleaved windings," "inner windings," and "outer windings," SPS has found nothing in the combination of sections to preclude a set of windings including *both* "interleaved" windings and "inner" / "outer" windings (i.e., interleaved windings are not mutually exclusive from inner / outer windings based on the referenced portions of SPS's patent specifications).  PPP argues that, because col. 18, lines 59-63 state that "FIG. 4D shows a variation of the card antenna, designated CA, which is similar to the card antenna CA of FIG. 4A, except that here the two windings E and D are interleaved with one another, rather than the one winding E being disposed entirely inside of the other winding D," windings that are "interleaved," cannot also constitute "inner" and "outer" windings.  The cited portion of the '240 patent does not go that far.  Instead, the cited portion of the '240 patent merely juxtaposes "interleaved" windings with windings having "one winding ... being disposed entirely inside of the other winding."  Contrary to PPP's assertion, the cited portions of the '240 patent do not go so far as to imply that "one winding being disposed *entirely inside* of the other winding" (emphasis added) is identical in all cases to one winding being considered an "inner winding" and another winding being considered an "outer winding."  In other words, a winding being disposed

"entirely inside" another winding, as illustrated in FIG. 4A of the '240 patent, does not necessarily represent all possible arrangements of an "inner winding" under SPS's asserted patents (and likewise for "outer windings," *mutatis mutandis*).  Similarly, simply because one winding of FIG. 4D of the '240 patent is not disposed "entirely inside" the other winding, does <u>not</u> necessarily mean that an "inner winding" and an "outer winding" are not present in FIG. 4D.

As such, at this pleading stage, whether windings are "interleaved" has no bearing on whether such windings can be considered "inner windings" or "outer windings."  Hence, SPS maintains that the "inner windings" and "outer windings" labeled in the Complaint are infringed, literally if not by equivalents and, at the very least, there is no genuine dispute that this assertion is plausible at this stage.  As has been the case with many issues raised in PPP's Motion to Dismiss, PPP is, at best, quibbling over the construction of the claim terms.  Because this is a question of fact, a dismissal on this basis is improper.  *See, e.g.*, *Absolute Software*, 659 F.3d at 1129-30.

For at least this reason, the Court should deny PPP's Motion to Dismiss relative to claims 1, 4, 6, and 9 of the '240 patent; claim 6 of the '932 patent; and claim 5 of the '304 patent.

## C.    Indirect Infringement

As noted above, PPP argues that it cannot be liable for inducement because the Complaint did not plead that PPP knew about the patents before suit was filed.  SPS disagrees with PPP's assertion, but SPS does not want to waste discovery resources and burden the Court with this issue at this time.  Accordingly, SPS agrees to drop all allegations of indirect liability, without prejudice, at this time.[3]

---

[3] SPS reserves the right to assert allegations of indirect infringement against PPP in the future as warranted by the facts and allowed by the Court.

## V.    ALTERNATIVE RULING and CONCLUSION

In view of the foregoing, SPS requests that PPP's Motion to Dismiss be denied, and that a

scheduling conference be set to move the case forward promptly.  However, if the Court is inclined

to accept PPP's arguments in whole or in part, SPS requests in the alternative that it be allowed to

amend the Complaint and correct any perceived deficiencies.


|  | POTTER ANDERSON & CORROON LLP |
|---|---|
| OF COUNSEL: | |
| Daniel A. Boehnen | By:  */s/  Philip A. Rovner* |
| Paul H. Berghoff | Philip A. Rovner (#3215) |
| Grantland G. Drutchas | Jonathan A. Choa (#5319) |
| Andrew H. Velzen | Hercules Plaza |
| MCDONNELL BOEHNEN | P.O. Box 951 |
| HULBERT & BERGHOFF LLP | Wilmington, DE 19899-0951 |
| 300 South Wacker Drive | (302) 984-6000 |
| Chicago, IL 60606 | provner@potteranderson.com |
| (312) 913-0001 | jchoa@potteranderson.com |
| | |
| Dated:  March 29, 2022 | *Attorneys for Plaintiff* |
| | *Smart Packaging Solutions SA* |